JUNE 3, 1803.

# Richard Meaux  v.  Leonard  Helm's  Heirs.

*Upon an appeal  from  a decree  of  the Lexington  District  Court.*

1. A court of equity will not enforce the specific execution of a contract for
the conveyance of land which has been brought about by fraud or mistake, or
which has been attended with hardship, occasioned by the delay of the com-
plainant in performing his part of the contract.

2. Where Q bought of H a tract of land and agreed to pay for it in forty
days in continental currency, which he then knew was depreciating rapidly,
and would soon become worthless, of which depreciation H was not fully
advised, and Q delayed payment for a number of years, and until the currency
became worthless—*Held:* That a court of equity should not decree a convey-
ance of the land on Q's motion, or that of his assignee.

3. Although time is not generally considered by a court of equity as of the
essence of a contract for the conveyance of land, yet, when the consideration
is payable in a currency rapidly depreciating in value, it will be so regarded.

4. Where the vendor in a contract for the conveyance of real estate died,
and a bill was exhibited against his heirs for a specific execution, the fact that
the executor of the vendor had obtained a judgment for the consideration
agreed to be paid for the land, will not be considered such a confirmation as
will bind the heirs to the specific execution of a hard and unconscionable con-
tract.   The contract and judgment should be set aside upon equitable terms.

This suit was instituted by Richard Meaux, to obtain deeds of
conveyance for a settlement and pre-emption for 1,400 acres of
land, on Jessamine creek, now in Jessamine county, which on the
6th day of August, 1781, were sold by Leonard Helm, the ances-
tor of the defendants, to Thomas Quirk, of whom Meaux is the
assignee, for £35,000 of the then current money of Virginia, pay-
able on or before the 15th day of the September following.

It is the peculiar province of courts of chancery to compel the
specific performance of contracts; and this they will do after the
time agreed on by the parties for execution has elapsed, and with-
out an inquiry into the equality of the considerations.   There are,
however, several exceptions to this general rule.   For example,
where a contract on the part of the complainant was fraudulent in
its origin, and was entered into by the other party by mistake
produced by the fraud; or when it has afterward been attended
with some peculiar hardship, occasioned by a delinquency on the

part of the complainant, for which an adequate compensation can not be devised. On either of these circumstances appearing in evidence, the court will dissolve the contract, if the parties can be left or be put in the same condition they were before the contract was made. It is urged that both these defects are apparent in the contract now under investigation, and that by a dissolution thereof, both parties will be left or can be put in *statu quo.*

As to the first of these points, it is proven that this contract was entered into at the falls of the Ohio river, at a time when the sudden or rapid depreciation of the then paper currency was not generally known or expected in this country; and that Quirk had shortly before returned from Virginia, and probably was well acquainted therewith. Indeed, Quirk's knowledge of the rapidity of depreciation in the eastern parts of the United States, is rendered certain by his declaration just before the contract was concluded, that in a short time the proposed price of the 1,400 acres of land would not buy a sow and pigs. On the reverse it is proven to be very improbable that Helm knew that this currency was depreciating much faster in other parts of the Union than in Kentucky. And Helm's ignorance of the fact may be inferred from his having sold a settlement and pre-emption of 1,400 acres, lying in the midst of the rich lands of this country, for a sum which, by the scale of depreciation, only amounts to £ .70 specie. It may, notwithstanding, be doubtful whether fraud on the one part and mistake produced thereby on the other are so fully proven as to authorize an absolute dissolution of the contract. But the court could not hesitate, on the proof which has been produced, to refuse decreeing conveyances for the land until its specie value at the time the contract originated should be ascertained and paid, with legal interest thereon. And on this footing the court would place the parties, did it not appear that after the contract was made it has been attended with several peculiar hardships to Helm and his heirs, occasioned by the delinquencies of the complainant and Quirk, his assignor; which, considered in conjunction with the evidence already recited, seem to render it still more proper to decree an unconditional dissolution; provided the parties can be placed in the situation they would have been had the contract never existed.

1st. It does not appear that the price of the land was paid or tendered on or before the day it became due. A default of this kind, as has been observed, is not commonly regarded by courts

of chancery. The reason is, that where payment was to have been made in specie, which is of universal use and permanent value, the loss occasioned by the delay can be compensated by legal interest. But it is easy to conceive that a delay of payment in paper currency must almost in every instance subject the creditor to inconveniences, for which an adequate compensation can not be ascertained; and this was remarkably the case as to the paper currency now in question. Indeed, in this country, where money can not be borrowed for legal interest with the same facility as in England, justice requires that our courts of chancery should, in the same degree, be less disposed than the court of chancery in that country to decree the execution of contracts, when it appears probable that a delay in the payment of the consideration, even in specie, had occasioned a peculiar hardship to the other party. And as in this contract, payment was promised to be made within forty days from its date, it ought to be presumed that Helm then contemplated to accomplish some special purpose with the money, from which he was prevented by the failure of Quirk.

2. But, further, the payment was not made before paper money ceased to be a legal tender, nor whilst an advantageous purchase of land warrants might have been made therewith, which, about that time, was generally considered as an object of singular importance; and either to pay debts or to purchase such warrants must have been Helm's object in contracting for so large a quantity of that currency.

3. Moreover, it does not appear that prior to the institution of this suit, which was twelve years after paper money ceased to be a currency, the sum in specie was tendered, which the legislature had pointed out as an equivalent. And during this period Helm died and the land descended to his heir, who, probably, was uninformed of equitable circumstances in his favor, which Helm could have pointedly proven. This, it is conceived, ought to be considered as another peculiar hardship occasioned by the delay of Quirk.

4. But had the contract been *bona fide* on the part of Quirk, and not attended on the part of Helm and his heirs with the hardships which have been stated, to be left in suspense for such an unreasonable length of time, whether Quirk would ever be able and willing to pay for the land, was certainly a peculiar hardship of great magnitude. It indeed appears by the exhibits that a suit at law had been instituted against Quirk by Helm's executor, for the

price of the land, and that in November, 1786, a judgment by confession was obtained for £44 9 8, including interest to the 15th day of that month; whereas, by the scale of depreciation, the debt and interest then amounted to about double that sum. This judgment, however, does not appear to be yet discharged; but if it had, and there was no presumption that the confession thereof was made by mistake or collusion, still it would not have been a confirmation of the contract on the part of the heirs of Helm, as it does not appear that they were privy to the suit or confession; on their part, equity could only require that the amount of the judgment, with legal interest, should be refunded to Quirk or his representatives.

On an attentive view of the several circumstances which have accompanied this contract, it seems to the court that at the time the present suit was instituted, the heirs of Helm were not under any obligation, in law or in conscience, to have made conveyances for the land to Quirk, or his assignee; or that the heirs of Helm can now be placed in a situation which will produce the obligation.

Wherefore, it is decreed and ordered, that the said decree of the district court, so far as it extends, be affirmed, and it is further decreed and ordered, that the said contract be dissolved; that the said judgment at law, obtained by the executor of Leonard Helm, deceased, against Thomas Quirk, be void and of no effect; and that each party do pay their own costs occasioned by this appeal, which is ordered to be certified to the circuit court of Fayette county.