John C. Gaut, Special Judge,
delivered tbe opinion of the Court.
Tbis bill is filed by tbe complainant, as tbe surviving partner of tbe late firm of McGregor & Bank-bead, at New Orleans, and of James Bankhead & Co., *58 at Nashville; and also surviving partner of the late firm of McGregor, Alloway & Co., at New Orleans, and N. E. Alloway & Co., at Nashville, against the defendant, Nathaniel E. Alloway.
It is an admitted fact by the pleading in the cause, that complainant, James Bankhead, George McGregor, now deceased, and respondent, Nathaniel E. Alloway, about the first of September, 1852, entered into partnership for the purpose of doing a general commission business in the city of New Orleans, under the firm name and style of McGregor, Alloway & Co., at New Orleans, and N. E. Alloway & Co., at Nashville. The said firms, although they carried on business under different denominations, the partners in each were the same, and in truth but one firm, and the denomination of N. E. Alloway & Co., at Nashville, was intended to be auxiliary to the house of McGregor, Alloway & Co., at New Orleans. Said firms continued, to do business under said denominations as partners as aforesaid, until the 22d of September, 1858, when the partnership was dissolved, and the defendant, N. E. Alloway, -withdrew from the concern.
On the same day, complainant and said George McGregor formed a partnership to continue the business and wind up the business of the old firms, under the style of McGregor & Bankhead, at' New Orleans, and James Bankhead & Co., at Nashville. This new firm of Mc-Gregor & Bankhead continued their business until the 26th of April, 1860, when the house of McGregor & Bankhead, at New Orleans, suspended business; and on the first of May, 1860, a formal dissolution took place, *59 and the assets of the concern were assigned to the complainant in liquidation; and on the 10th of September, 1860, the said George McGregor died insolvent.
Upon the withdrawal of the defendant, on the 22d of September, 1858, from said firm of McGregor, Al-loway & Co., and N. E. Alloway & Co., the complainant and George McGregor, paid defendant $3,000 out of the assets of said firm, for which he executed and delivered to them a receipt in the following words and figures, to-wit:
“Received of George McGregor and James Bankhead, three thousand dollars, in full of all claims of every description, and all interest whatever, real and personal, which I have had, or have, in the profits, assets, choses in action, or any other species of property belonging to the firms of McGregor, Alloway & Co., or N. E. Alloway & Co., of Nashville, Tennessee.
“Nashville, 22d of September, 1858.
(Signed) “N. E. Alloway.”
At the same time and place, an instrument of writing was signed and delivered by James Bankhead, the complainant, George McGregor, and N. E. Alloway, the defendant, in which the defendant sold his entire interest in the commercial firms of McGregor, Alloway & Co., of New Orleans, and N. E. Alloway & Co. of Nashville, Tennessee, and the lease on the office occupied by N. E. Alloway & Co., to McGregor & Bank-head, and also relinquished his elaim standing on the books to his credit, for and in consideration of the sum of $3,000, paid him jointly by said McGregor & Bankhead. And in and by said instrument, the com *60 plainant and McGregor undertook and bound themselves to pay all the outstanding liabilities of the concerns of McGregor, Alloway & Co., and 1ST. E. Alloway & Co., and indemnify said Alloway against the payment of the same.
The complainant has filed this bill to open and set aside what he denominates a settlement, which he says was made at and before said dissolution of the 22d of September, 1858, and to charge respondent, Alloway, his just proportion of the loss alleged to have accrued upon a large debt due to said firms from Dr. E. Thompson, of Williamson county, Tennessee, and other items. As to the solvency of the debt against Dr. Thompson, or if the representations of defendant were not fraudulently made, he represented said debt to be well secured and a good debt, and that complainant and McGregor acted upon these representations, believing them to be true, and permitted the defendant to withdraw from said firm with $3,000, when, in fact, the Thompson debt was not good and well secured, but was worthless, and lost to the complainant and McGregor; and that they sustained other heavy losses, heretofore noticed, by false representations made by defendant, and by false entries made by him upon the books of IST. E. Alloway & Co. All the fraudulent or false representations, and false entries upon the books, are substantially denied by the answer of the defendant, and he furthermore denies that there was any settlement made with a view to a dissolution of said firms, or that, in fact, any settlement was made; that it was a simple sale of his interest- in said firms to McGregor and complainant; *61 they having a general knowledge of the business, like himself, undertook to pay all the liabilities of said firms, and risk the collection of the debts due to said firms, and to permit him to retire from the concern with $3,000, when at the same time, there stood upon the books of the concern $10,006.94 to his credit.
The position assumed by the parties has forced us to a careful examination of the pleadings and proof in the cause.
Complainant’s bill in substance, was, that McGregor furnished monthly balance sheets from the house at New Orleans to the Nashville house, showing how the busi-ess stood. The last balance sheets forwarded by Mc-Gregor to N. E. Alloway & Co., at Nashville, extended to and ended with the first of September, 1858, which exhibited such a state of affairs as caused complainant to wish to retire from both concerns, and without proposing any basis of settlement, or making any calculations as preparatory to a settlement, complainant proposed to defendant that he, complainant, would pay his private account to the concern of $5,967.09, and pay a bonus of $5,000 to be let out of the concern altogether. To this proposition defendant objected, saying that it would be impossible for the firms to get along without complainant’s credit.
After the rejection of complainant’s proposition, he and defendant' went into a calculation, intended to be founded upon a basis of equality, for the purpose of ascertaining the rights and liabilities of each partner as against the others, and the partnership means that could be considered good and available. The calculations were *62 confined- to the commercial year of 1857-8, just ended, as to the loss of the concerns, because the losses before that time had been charged off the books, and given up as entirely worthless. But as' to the bad debts enumerated in this calculation, they extended back indefinitely, except when charged off the books.
The losses for the commercial year 1857-8, were put down in the calculation at $60,459.07, all of which was occasioned by the operations of the defendant in the purchase of produce outside of the regular commission business. The bad debts put down in that calculation, amounted to $15,772.68, making a total loss of $76,-231.75. But the debt due from Dr. E. Thompson was not taken into said' calculation of losses or bad debts, but was at the time, believed to be a good debt.
The profits of that commercial year, and the estimated gains upon a house bought in New Orleans, stock, etc.,' as by balance sheet furnished by George Mc-Gregor, to first of September, 1858> and memorandum made at the time, were set down in said calculation at $64,077.67, from which was deducted in said calculation, $10,625, for expenses at New Orleans, for the season; which left as profits for the season, $53,452.67, and which, when deducted from the total losses, and bad debts of $76,231.75, left as net loss, $22,779.98, and which loss, divided between the 'three partners equally, amounted to $7,593.02. At the time these calculations were made, there stood to the credit of defendant’s private account, on the books of 1ST. E. Allo-way & Co., the- sum of $10,006.94, and to the debt of ■complainant’s private account, the sum of $5,967.09, *63 and to the debt of George McGregor, $286.25. That George McGregor arrived at Nashville, about the 17th of September, 1858, and examined the calculations; and on the 22d of September, 1858, ,when complainant, McGregor, |and defendant, made the settlement, N. E. Alloway put down in his own figures, which have been preserved, the amount of the debt of the Thompson deed of trust, at $50,500, and the preferred debts, at $39,360, which being reduced by payment of some of them, in. whole or in part, would leave $15,140, to be paid on the Thompson debt, due to said firms of Mc-Gregor, Alloway Co., and N. E. Alloway & Co.; and in addition to that, there would be $4,000 more; that the result of said calculations showed, that after deducting defendant’s show of said losses and bad debts of $7,593.02, from the amount, to his private credit, upon the books, there would still be due him, $2,417.25. He then proposed', if complainant and McGregor would give him $3,000, he would give up all claim, and retire from both firms. Complainant offered him $2,000; this he refused. Complainant and McGregor consulted and agreed to give him $3,000, and did pay him over that amount, out of the assets of the firm; and the papers were respectively prepared and signed, under the belief, from the representation of defendant, that the Thompson debt was good, the largest note having been credited on the 7th of September, 1858, with $8,644, the proceeds of the note held as collaterals upon S. A. Pointer, and with $4.33 on the 14th of September^ 1858. The balance due upon said Thompson’s notes, at the date of said settlement, was $16,659.03; that the Thomp *64 son debt was credited in the business years of 1855 and ’56, and 1857 and 1858, but the largest portion, in the latter business year; that Thompson had deposited with N. E. Alloway;& Co., as collaterals, two notes upon S. A. Pointer, for $5,200 each, due respectively, the first of January, 1861, and the first of January, 1862; that Thompson made a deed of trust, on the 8th of June, 1858, to his brother, Absalom Thompson, as trustee; that defendant went to Williamson County, Tennessee, to examine the trust deed, and while there, took several notes from Thompson, in the aggregate covering the amount of his debt due to the firm, with interest, and dated them back to the 7th of June, 1858, that being the end of the year or years of his business; and prior to that time, the debt had vested in account. Defendant returned with the notes, and after examining the deed of trust, he reported to complainant, that the debt of E. Thompson was amply secured, and good beyond all question. Defendant attended the sale of Thompson’s property, under the deed of trust, on the 16th of August, 1858, and bought some negro slaves, and executed the firm notes for the purchase money, which notes complainant has been compelled to pay since the dissolution; that it was upon the faith of that statement, submitted by N. E. Alloway, to complainant and McGregor, and relied upon by them at the time of the settlement, that the settlement was made.
The foregoing are all of complainant’s allegations in reference to the Thompson debt and the settlement, that we deem material to repeat.
Respondent answers upon the same subject matters, *65 and in substance says: Said McGregor, bad come to Nashville from New Orleans, and bad brought with him the papers of the firm, showing the result of the season’s business; as was his custom at the end of each season. He had beep in Nashville a few days, in which time, examination into the general condition of our business had been made; and on the morning of the 22d of September, 1858, complainant and McGregor had themselves been making a more particular estimate, of which they knew at least as much or more about than the defendant did. Defendant went into the office, whilst they were at the desk looking over their calculations, when complainant remarked he would like to withdraw from the business, and would give the concern $5,000 to let him out; to which, defendant objected, stating, that he, complainant, owed the concern fully that much, and that amount would not more than make his private account good. Defendant then remarked, if they wished, he would go out of the business; that he had upwards of $10,000 to his credit on the boooks, and he would go out if they would give him $5,000, which they refused. Complainant and McGregor left the office. After a while they returned, and complainant said they would be willing to let defendant go out if he would give them the balance to his credit; this he refused. Defendant then offered to leave if they would give him $4,000, which they declined. Defendant then offered to take $3,000, to which complainant and McGregor at once agreed, on condition defendant would surrender to them in addition, his rights under the lease of the office *66 property occupied by tbe firm, which had nearly five years to run, and estimated to be worth $2,000, to which defendant reluctantly assented, they agreeing to hold him harmless against the debts of the concern; that complainant was more familiar with the business of the concern than respondent. Eespondent does not recollect of complainant offering a bonus of $5,000 to be permitted to withdraw at the time stated. He admits he made the settlement with Dr. E. Thompson, and took his notes; that the reason he took the small notes was to sue before a magistrate, and take judgment, and file bills against parties in Williamson and Maury counties, who had loaned money to Thompson at usurious rates of interest, in the hope of recovering something for the firm, fearing that most of the debt could not be realized from the deed of trust — all of which he fully explained to complainant on his return. Eespondent at the instance of complainant, attended the sale of Thompson’s property under the deed of trust, and bought some negroes, for which he gave the notes of the firm to the trustee; and on his return reported to complainant what the property sold for as fully as he could remember. We then made an estimate, and the complainant remarked, ‘I fear we will lose a large portion of the Thompson debt.’ All this occurred a month previous to the withdrawal of defendant; and at the time of his withdrawal complainant knew as much about the chances of the collection of the Thompson debt as defendant did. There was no statement or figuring relative to the Thompson debt, present on the 22d of September, 1858, the day *67 respondent retired from the firm. But on the contrary, some months afterwards, when defendant was at the office of complainant, asked him if he had such scraps with figures on them. He denies that, in the contract of dissolution, the Thompson debt was taken as a good debt upon the representation of defendant, or that the Thompson debt, or any other, was mentioned, or any special representation in regard thereto; but the contract of dissolution was based upon the general idea and views of the parties as to the ultimate results and chances of success. There were no figures made about it on the 22d of September, 1858, nor were there any figures before them that day; and if complainant has any of defendant’s figures as to the debt, they were made long before the dissolution. Further on in the answer, the defendant says: He presumes complainant has some figures that defendant made in reference to the Thompson debt, as both were uneasy about it, and they were made, so far as respondent made any, before the 22d of September, 1858, and they were not before the parties on that day.” He denies that there was any settlement made. It was a sale in bulk, and the purchasers took all the risk upon themselves; and he denies that there was any fraud, deception or concealment on his part, or mistake, or superior knowledge on his part.
From the foregoing extracts, taken from the allegations of the bill and answer, it will be observed that some of the most material allegations in complainant’s bill, are neither fully admitted, nor denied by the the answer. The charge in complainant’s bill that he *68 and defendant went into an examination and calculation of the losses for the last year, ending the first day of September, 1858, upon the balance sheet forwarded to them by McGregor, and the bad debts, and found the losses to be $60,459.07; and bad debts to amount to $15,772.68; making the total loss $76,231.75; and net gains for the year $53,452.67; making a net loss to the firm of $22,779.08. This charge is not answered by the defendant, but he does deny in his answer, that any settlement was made. He denies that he made any figures on the 22d of September, 1858, or 'that any figures were before them on that day; that if complainant has any of his figures, they were made long before the dissolution.
He does not, however, fully deny the fact that he made any false or fraudulent representations in relation to the solvency of the Thompson debt, or that it was taken by complainant and McGregor on the dissolution as a good debt, or that anything was said about it more than any other debt of the concern.
To decide this cause satisfactorily to ourselves, and to do full and complete justice between these parties, if’we can, we refer to the proof in the cause.
Matthew Watson, proves that, after an examination of the books of McGregor, Alloway & Co., and N. E. Alloway & Co., the debt of Dr. Thompson nowhere appears to be charged to account of profit and loss, but on the balance sheet of the first of September, 1858, forwarded by McGregor, Alloway & Co., from New Orleans, to N. E. Alloway & Co., of Nashville, exhibits an account against Dr. Thompson, due the *69 firm of $28,923.11. He also proves a letter written by complainant in the firm name, on the 22d of June, 1858, in reference to a letter from McGregor, making inquiry about the Thompson debt, in which complainant said: “We regret to inform you that it became necessary for the Doctor to make an assignment for the benefit of his creditors. Mr. Alloway went out to look into matters and is entirely secured. Accor-Aing to our estimates, he will owe you about $25,-000. There are two thousand dollars and upwards, to his credit on our books, being sums collected from time to time upon collaterals, and we have in our vault, ten thousand dollars in Samuel Pointer’s notes, as collaterals; these notes are undoubted. The assignment, after securing his father and brother for sundry amounts, embraces our debt nest in order.”
Mr. Watson further proves that the writing 'and figures upon a paper marked exhibit 13, to his deposition to be in the hand writing and figures of defendant, Alloway, which are stated this:
Amount of sale,---$50,500
Notes,-4,000
$54,500
PuryePs estate,-$16,000
23,360 — 39,360
$19,140
Lamb,-2,000
Gracy,-2,000
Exhibit 14 to Watson’s deposition, seems to be a statement of what certain negroes, lands, furinture and *70 railroad stock sold for, to-wit: $38,750; witb four thousand dollars added thereto, in figures, all in the hand writing of defendant, Alloway, except figures $4,-000, as proven by Watson; and on the same paper, exhibit 14, is a statement of debts to A-. Thompson and John Thompson and others, with the amount in figures opposite to the name of each — all of which Watson proves to be in the hand writing and figures of defendant, Alloway; from which writing and figures, we are left no room to doubt that at some time after the 16th day of August, 1858, the day on which Dr. Thompson’s property was sold by the trustees under the assignment, and before the dissolution on the 22d of September, 1858, the defendant did make out a statement to the complainant, at least of the amount of the sale and other supposed assets, and of the preferred debts, and showing a balance of nineteen thousand or more dollars, to be next applied in order to the payment of the debt due to the firm.
William Nicho! proves that defendant told him, on his return from Williamson County, that the Thompson debt was entirely secure, and I have no recollection in after conversation, and before the dissolution of the partnership, of any doubt being entertained or expressed. G. M. Fogg says, in August, 1858, after Mr. Alloway returned from the trust sale of Dr. Thompson’s property, he told me the property had sold better than he expected, and that there would be enough funds coming to McGregor, Alloway & Co., out ,of the proceeds of the sale, as he thought, to secure their debt, or nearly so; that they would not probab *71 ly lose more than one thousand dollars; that outside of the deed of trust, they had some collaterals that from both these sources he considered them nearly secured. A. Thompson says after the sale, Mr. Allo-way stated to me, he was well satisfied with the sale, and he considered the debt due to N. E. Alloway & Co., as being perfectly secured. This conversation was on the day of sale. S. B. Lee says: “Alloway attended the sale, and had a blank book and pencil, and set down the sale of every article of property; and in the evening, after the sale was over, he told me he considered the debt to N. E. Alloway & Co., perfectly secure. I heard him say several times after the sale that the debt was secured. I think he made this statement to me in the office of N. E. Alloway & Co., about the first of September, 1858, in the presence of Mr. Bankhead. About the 21st of April, 1859, I inquired of him how he got along with the Thompson debt; he said he was out of the scrape; that he had sold out and dissolved with his partners, and that there would be very little, if anything, realized or paid on said debt. S. A. Pointer proves that Alloway said on the day of the sale, after the sale was over, that the debt of Thompson to the firm was amply secured. I heard him say several times after the sale, that the debt was secured; I think he made the statement to me in the office of N. E. Alloway & Co., about the first of September, 1858, and I think Bankhead was present.
A. Thompson, j trustee, proves that he made his first report of collection and payment, on the 15th of April, *72 I860, and that he has paid out on the preferred debts $52,545.03, and nothing has or ever will come to his hands to be paid upon the debt of N. E. Alloway & Co.; that the preferred debts were much larger than expected until settlements were made, etc. Mr. "Watson further proves, that the lease of the office of the firm in Nashville, although taken in N. E. Alloway’s individual name, was for the benefit of the firm, and the firm notes of N. E. Alloway & Co., given for the next ensuing year’s rent from the 27th of July’ 1858, the date of said lease.
The proof of these witnesses is not opposed by any proof in this record that we have been able to find; and there is other proof in the record, not here reported, from an actual inspection of the books, tending to show that the firms sustained heavy losses for the last commercial year ending the first of September, 1858. We are, therefore, satisfied from the pleadings and proof in this cause, that, after the receipt of the balance sheet from the house at New Orleans of the first of September, 1858, and before the dissolution on the 22d of the same month, that complainant and respondent did make some investigation and calculations as to their losses for the last commercial year, and losses in bad debts. And the proof is persuasive, at least, that the losses were found to be $22,779.08, as charged in complainant’s bill, and that those calculations or estimates were examined and considered of by Mc-Gregor after his arrival in Nashville, on the 17th of September, 1858. We are furthermore satisfied, from the pleadings and proof in the cause, that all the part *73 ners believed that the debt due the concern from Thompson was secured by the assignment to A. Thompson, trustee, and that it was a good debt and would be realized by the firm; and that respondent had repeatedly represented to complainant and others, both before and after the sale of Thompson’s property under the trust deed, that the debt was secured by said assignment, and that complainant and George McGregor relied upon those statements of respondent, and acted upon them as being true as represented, and acted under the belief. The dissolution took place on the 22d of September, 1858; by the terms of which the defendant paid his one-third of said estimated loss, to-wit: $7,593.02, out of the funds to his credit on the books of the firm, and the balance of the sum to his credit, to-wit: $3,000, was paid to him. We are not prepared to say from the proof, that defendant acted fraudulently or in bad faith towards his co-partners, when he represented the Thompson debt good and well secured; but on the contrary, the proof tends to show that he represented the amount of the sales of the Thompson property approximating to accuracy, and that he had made inquiry of the Clerk of the County Court of Williamson county, touching Thompson’s liability as guardian of the heirs of Puryear, deceased, and to other parties of the preferred class, and was told by said clerk and other parties, what the debts in the preferred class would probably amount to, when, in fact, as shown by the testimony of A. Thompson, trustee, when he settled those claims, they amounted to much more than he, as trustee, had supposed they would, and as was *74 represented to Alloway. We therefore believe that all the partners acted under a mutual mistake in the belief that the Thompson debt was a good debt and secured by the assignment, when the firm dissolved on the 22d of September, 1858; that defendant in good faith represented to his co-partners that the debt was good and secured by the assignment; and that his co-partners relied upon his statements and based said dissolution upon said representations, when, in truth and in fact, those representations and belief of respondent, and belief of complainant and McGregor, were without foundation, as subsequent events have shown that the Thompson debt was worthless, at and before the said dissolution, and wholly lost to complainant and Mc-Gregor.
Now, the question presented is two-fold: First, — Is respondent responsible to complainant for any portion of said loss? and if so, for how much? These are questions depending upon authority. The general rule is, that an act done, or contract made under a mistake or ignorance of a material fact, is voidable and relievable in equity. The rule applies not only to cases where there has been a studied suppression, or concealment of the facts by the other side which would amount to fraud, but also to many cases of innocent ignorance and mistake on both sides: 1 Story’s Equity, sec. 1840.
In cases of mutual mistake, going to the essence of the contract, it is by no means necessary that there should be any presumption of fraud. On the contrary, equity will often relieve, however innocent the parties may be: 1 Story’s Eq., secs. 142 and 143. Again, *75 in see. 523, the same author says: If there has been any mistake, or omission, or accident, or fraud, or undue advantage, by which the account stated is in truth vitiated, and the balance is incorrectly fixed, a court of equity will not suffer it to be conclusive upon the parties, but will allow it to be opened and examined. In other cases, as of gross fraud, or gross mistake, or undue advantage, or imposition, made palpable to the court, it will direct the whole account to be opened and taken de novo. In other cases, where mistake, or omission, or inaccuracy, or fraud, or imposition is not shown to effect or stain all the items of transaction, it will allow the account to stand, with liberty to the plaintiff to surcharge and falsify. Sometimes a still more moderate course is adopted, and the account is simply opened to contestation to one or more items, which are specifically set forth in the account of plaintiff as being erroneous and unjustifiable. It seems to be well settled, that, if a party innocently misrepresents a material fact by mistakte, upon which another is induced to act, it is as conclusive a ground of relief in equity, as a willful and false assertion, for it operates as a surprise and imposition on the other party. In such case, the party must be held to his representations: 1 Story’s Eq., sec. 193; Lewis vs. McLemore and others, 10 Yerger, 206-209; 4 Merriwether et al. vs. Larman et al., 3 Sneed, 448; Phillips & Jardon vs. Hollister et al., 2 Coldwell, 269, 277.
If all the parties believed, at the time of the dissolution, that the Thompson debt was good, and it turned out otherwise, the loss is the result of a mistake, from *76 which defendant derived a benefit at tbe time of the dissolution, a court of equity will grant relief against him, although no fraud intervened: Brents and Wife vs. Brown et al., 3 Head, 560. We therefore think the defendant should be held to account to the complainant for the Thompson debt. It was a large debt, and we cannot think that the complainant and McGregor would have consented for respondent to retire from the firm upon the terms agreed upon, and take the risk and chances of collecting the Thompson debt, but for the fact that they, as well as he, believed at the time, the debt was secured by the assignment. The debt was too large an item to be' slightly regarded by business men. If all three of the co-partners believed, at the time of the sale and dissolution, that the debt was good, when in fact it was worthless, they all acted under a mutual mistake, and defendant is bound to account for a part of the loss. But whether he is liable for the one-half or one-third, involves the second proposition. We do not think the defendant can be held to account to complainant for more than one-third of the Thompson debt due at the time of the dissolution, less the sum paid thereon since that time, of $375.75, proceeds of railroad stock held as collateral, with interest on the same until paid. And if ever the Thompson debt, or any portion thereof, is collected, the defendant is entitled to one-third of such sum as may be collected.
We do not think the authorities to which we have been referred by complainant’s counsel apply to a case like this. If the firm in question had been dissolved *77 by efflux of time, by the death of one of the partners, or by voluntary dissolution of the partnership; and in the winding up of the concern, and payment of its debts, complainant had been forced to pay all the debts of the concern, or more than his just proportion, and McGre-gor having died, and his estate insolvent, would be apportioned and distributed between complainant and respondent, and respondent would be held to contribute and pay complainant one-half the sum he had paid. But the case supposed is wholly different to the case before the Court. The case in hand is, where the dissolution took place by a sale of defendant of his entire interest in the assets of the firm to Bankhead and Mc-Gregor,. they undertaking to pay all the liabilities of the firm, and defendant retired therefrom. While on the one hand a court of equity will open settlements made, on the ground of mistake, surprise, accident, false representations made by one party, believed by the other, and acted upon to his prejudice, or for fraud; on the other hand ¡.the Court must be careful not to trench upon the right and power of parties to contract, and to be bound by them when fairly made in the absence of the exceptions before enumerated. If, in the dissolution, complainant and McGregor contracted and agreed with defendant, to pay all the liabilities against the concern, and it turns out that they have made an improvident contract, a court of equity cannot relieve them against their own voluntary act; or, if the death and insolvency of McGregor has caused complainant to pay more than his just proportion of said liabilities, that risk complainant took upon himself in the contract of *78 dissolution; nor is this case like the case of three or more co-securities, and one has had the whole debt to pay, and the third surety is insolvent; the surety who paid the debt can compel the second surety to contribute to him one-half the sum paid. The equity does not arise out of contract, but an equity between two innocent sureties, holding each to bear one-half the loss; but in this case, we do not disturb the contract made between the parties, only so far as to give complainant and McGregor what they believed they bought of defendant by the terms of the dissolutiou. They believed the Thompson debt was good, and on that basis defendant sold them one-third of that debt, and as it has turned out that the debt was worthless, defendant must make good their expectation and belief. The point can be better illustrated in this view: If the Thompson debt had been known to all the partners to be worthless, at and before the dissolution, it is fair to presume, they could have set it down to the list of bad debts, and the net losses of the concern would have been increased by the amount of the Thompson debt, and defendant would have been required to pay one-third of the whole loss, instead of one-third the loss as found by the parties. This, we think,, he is bound to do, and no more.
As to the returned commissions of $139.29, allowed Dr. Thompson by defendant, as we understand this specification from all the lights we have derived from the pleadings and proof in the cause, the facts in relation thereto, are substantially as follows: The balance sheet made out on the first of September, 1858, by the house *79 of McGregor, Alloway & Co., of New Orleans, and forwarded to N. E. Alloway & Co., of Nashville, showed Dr. Thompson’s account to be, at that time, $28,-923.71, which was, on the 2d of September, 1858, transferred on 'the books of McGregor, Alloway & Co., to N. E. Alloway & Co., at Nashville. At the same time, N. E. Alloway & Co., owed' Dr. Thompson, as shown by their books, the sum of $2,135.39, which sum deducted from Thompson’s account due the firm, left as balance due from Thompson to the .concern, the sum of $26,788.32. After the 8th of June, 1858, the date of Thompson’s assignment — but when, does not distinctly appear — defendant and Dr. Thompson made a settlement, and defendant took Thompson’s six several promissory notes, payable to N. E. Alloway & Co., due one day after date, and dated back to the 7th of June, 1858. One note for $23,022.03, and five notes for $475, each, amounting in the aggregate to $25,397.03, leaving the discrepancy between the balance of said account, and the aggregate of said notes, of $1,391.29. This item is denominated return commission, and -an item counted in this litigation. Brothers proves that Thompson was not entitled to this credit; if he was, the witness has no knowledge of the fact, nor can he find anything upon the books to justify it. Nor was the firm at New Orleans ever notified of the credit. The entry on the blotter of N. E. Alloway & Co., is in the hand writing of defendant, but without date: Dr. Thompson is entered with $1,391.29, “returned commissions.” On the blotter of same house, under date, 8th of September, 1858, an entry is made in the hand wri *80 ting of defendant. McGregor, Alloway & Co., are debited with $1,391.29, “returned commissions” on Thompson’s account, but no advice of this statement was given to the New Orleans house. Thus the matter stood at the time of the dissolution. Complainant avers in his bill, that, at the time he and defendant made an estimate and calculation of profits, and losses and bad debts, they had before them, the balance sheet of the New Orleans house, of the first of September, and the balance sheet of the Nashville house, of the 15th of September, 1858, and by reason of the false and fraudulent entries of the defendant, in relation to the Thompson debt and others, the real losses were much greater than appeared upon the balance sheets. Or, in other words, the balance sheets showed more assets, by several thousand dollars, than really existed, by reason of defendant’s entries on the blotter, of which complainant and McGregor had no notice at and before the dissolution.
Respondent in his answer, says, that the returned commissions to Dr. Thompson, • of $1,391.29, were for an improper charge made against him by McGregor, Alloway & Co. We have been referred to no proof, nor have we been able to find any proof in the record, tending to show that Dr. Thompson had been improperly charged upon the books of McGregor, Alloway & Co., and we are, therefore, constrained to presume, that the balance sheet is correct, until the contrary is proven. They were partners, and their books are presumed to be correct. If the balance sheet forwarded to N. E. Alloway & Co., at Nashville, was incorrect, it was the *81 duty of tbe Nashville house to notify the- house in New Orleans of the error. This is proven by Brothers not to have been done. The business of the two houses had been very large. The balance, sheet from New Orleans shows a business embracing $459,989.32, and the house at Nashville is shown by proof, to involve a business of $260,000, or about that sum, amounting in the aggregate to $719,998.32, and we think the estimates and calculations of profits and losses and bad debts, that were made to ascertain how their business stood preparatory to a dissolution, must have been made, and based mainly, if not entirely, upon the balance sheets, without reference to the entries upon the blotter of said returned commissions to Dr. Thompson, and other entries hereafter alluded to. It is even doubtful whether complainant and McGregor had ever seen these entries on the blotter, or had any knowledge of the same. But on the contrary, we believe from the proof and circumstances attending the transaction, they had no such knowledge. We, therefore, believe, for the reason stated in another part of the opinion, that defendant is bound to account to complainant for one-third of said sum of $1,391.29, denominated returned commissions to Dr. Thompson, with interest upon the same, from the 22d of September, 1858, until paid. And for the same reasons the defendant must be held to pay complainant, one third of the $1,107.78, deducted from the account of J. L. Bradley, with interest from the 22d of September, 1858, until paid. The facts'in relation to'this item, are these: J. L. Bradley became indebted to McGregor, Alloway & Co. The *82 balance due said firm upon his account, was $7,087.81. It was sent on the 23d of July, as proved by Brothers, by McGregor, Alloway & Co., of New Orleans, to N. E. Alloway & Co., at Nashville, to be collected. And on the 27th of August, 1858, defendant made, upon the blotter of the Nashville house, an entry in his own handwriting, deducting from said account, the sum of $1,107.78, and that deduction was never communicated to the house at New Orleans, as proven by Brothers. If those two entries in relation to the Thompson and Bradley accounts had been entered upon the books of the concern, they would have augmented the profit and loss account upon the books $2,494.79, and have diminished the apparent profits of the concern precisely that amount.
The tobacco speculation entered into, in the spring of the year, 1858, between McGregor, Alloway & Co., of the one part, and Henry Rodwall & Co., of New Orleans, of the other part, is involved in much perplexity, as to the correct solution between the parties to this record. The complainant avers in his own bill, that the losses to the firm in this transaction were very large, and the facts in relation thereto, exclusively within the knowledge of the defendant; that he had been repeatedly requested by the house at New Orleans,' to furnish them with the amount, but he never did so; that at the settlement in Nashville, in September, 1858, in the list of losses made out, the loss in the Bod-wall speculation was put down at Alloway’s dictation, at $8,459.40, to the firm; but it has since turned out that the loss to the firm, was $9,675.87, making a dif *83 ference of $1,216.47, which latter sum, complainant seeks in his bill to hold defendant to account; that complainant and McGregor, in said settlement of September, 1858, had to rely, and did rely upon the statement of Alloway in regard to this item of loss. Respondent in his answer to said charge says: the proposition to go into this speculation came from Mc-Gregor, of the house in New Orleans, who had agreed with Rodwall & Co., to go into an almost unlimited amount of tobacco purchases, on joint account. And on receipt of the information, complainant and respondent consulted, and agreed that respondent leave next day, to project arrangements to purchase the tobacco. When McGregor came to Nashville, the accounts brought with him, showing the result of the transaction, were not fully made out by the house in New Orleans, because the sales of tobacco were not completed. Complainant and McGregor disputed over the probable result of it, and appealed to respondent to put down figures connected with the matter as they dictated, which he did, the whole affair being measurably guess work. He denies trying to deceive complainant and McGregor in regard to anything connected with said business; that complainant and McGregor were more thoroughly acquainted with the condition of the business than himself, they having been mainly, and almost wholly instrumental in placing the house under the liabilities it bore. Mr. Fisher proves, that in the early part of 1858, he met the defendant in New Orleans, and he. went with defendant to Rodwall, and heard defendant *84 propose the tobacco speculation to Rodwall, and heard the conversation. Witness was salesman of tobacco in the house of McGregor, Alloway & Co., in New Orleans, at the time. Rodwall did not at that time, agree with Alloway to go into the speculation. Neither complainant nor McGregor were present. Subsequently Rodwall & Co., agreed to go into the speculation of tobacco, and I, under the instructions of Rodwall and McGregor, drew up the contract. It was signed on behalf of McGregor, Alloway & Co., by McGregor. He proves that he was employed in the spring of 1858, to buy tobacco for N. E. Alloway & Co., in certain counties; that he was frequently in the office connected with the business; that complainant knew all about the purchases of tobacco; but, upon many occasions, he heard complainant disapprove of the Rodwall speculation in tobacco, and complain of the prices being given for the same. Alloway did mainly the out-doors business; that he was better acquainted with the tobacco-growers, and a good judge of tobacco. There is other proof in the record, to show that defendant himself, in person, and Eisher, set on foot, the Rodwall speculation in tdbacco, Avhich resulted in heavy losses to the firm, as well as to Rodwall & Co. But the proof clearly shows that speculation was gone into with a knowledge of all the partners, and with the consent of McGregor at least, who signed the contract in the name of the firm. We find, from an examination of the balance sheet of the New Orleans house of the first of September, 1858, that the losses in the Rodwall tobacco speculations are not set down, and *85 for the reason, that the sales of tobacco were not completed at that time, as stated in defendant’s answer, and as the proof shows.
Brothers proves that the adventure lost $19,351.73, one half of which McGregor, Alloway & Co., and N. E. Alloway & Co., sustained, to-wit: the sum of .$9,-675.87, and he also proves exhibits made out in the hand writing of defendant, showing the whole loss on the Rodwall tobacco speculation, to have been $16,-918.81, one half of which is $8,459.40. The difference between the actual, loss to the firm, and that made out in the defendant’s handwriting, is $1,216.47. The complainant in his bill, seems to hold respondent accountable for his proportion of the latter sum. We think, in justice and fairness to the parties, the defendant cannot be held to account for any portion of the same. At and before the 22d of September, 1858, the partners made estimates from their balance sheets, of the profits and losses and bad debts, with a view to a dissolution of the firms, and transfer of defendant’s interest in the same, to complainant and McGre-gor; and the losses upon the Rodwall tobacco speculation were not upon the balance sheets of either house, and could not have been, because the sales of the tobacco had not been completed at that time, as is shown by the proof. But enough was known about the adventure to satisfy all the partners concerned, that the firm had sustained a heavy loss; and on that settlement with a view to a dissolution, if the defendant did not set down the total loss at $16,918.81, and one half to the firm at $8,359.40, that sum ap *86 proximated as near to the real loss, as it was possible for the defendant or any one else, to do at that time, because it was impossible for him or any one else, to foretell what would be the actual loss, until the tobacco was all sold.
The complainant, McGregor, and respondent, based their settlement and dissolution upon $8,458.40, as being the supposed loss on the Rodwall speculation, with a foil knowledge that the loss might be greater or less than the sum put down. The complainant and McGregor took the risk upon themselves of the loss ultimately being greater, and the chances of the loss being less upon final sale of all the tobacco. In the very nature of the settlement and dissolution, the complainant and McGregor, took upon themselves the chances and risk of winding' up an old business, involving over seven hundred thousand dollars; and defendant cannot be held to account for their losses, unless misled by his acts. In this particular transaction, if complainant and McGregor had been so fortunate as to sell the remaining tobacco on hand, at a price to reduce the loss below the sum stated, they would have been entitled to the profits, and so on the other had, they must sustain the loss.
"We can see no fraud in defendant’s statement in regard to this uncertain and supposed loss, as to this item; and in the nature of things, complainant and McGregor took the ultimate result of the Rodwall tobacco speculation upon themselves. And of a like character is the Barker & Diffinderfer claim, of $2,093.21, set up in complainant’s bill. Barker & Diffinderfer *87 became indebted to McGregor, Alloway & Co., in the sum of several thousand dollars. Barker & Diffinderfer assigned or mortgaged a large lot of tobacco to Mc-Gregor, Alloway & Co., to secure the debt. Lewis G. Williams, claiming to be a partner with Barker & Dif-finderfer in the lot of tobacco, filed his bill against McGregor, Alloway & Co., and N. E. Alloway & Co., and Barker & Diffinderfer, and set up his claim and interest in the tobacco. The bill was filed at Clarks-ville, Tennessee, in 1857. The proceeds of the tobacco, on its sale, came to the hands of McGregor, Alloway & Co., and their debt against Barker & Diffinderfer, was ratified and charged off the books, in the handwriting of defendant, the 21st day of August, 1857. The suit of Williams was still pending and undecided, on the 22d of September, 1858, and was not finally determined until the October Term, 1860, of the Chancery Court at Clarksville, when the final decision was rendered in favor of Williams, against said firms and Barker & Diffinderfer, for $2,093.21, and costs. At and before the dissolution, on the 22d of September, 1858, complainant and McGregor knew of the pendency of said bill in chancery, of Williams against the firm; process had been served upon the firm, and they had counsel employed to defend against Williams. They are, or were, presumed to know fully as much about the probabilities of Williams’ chances of a recovery against the firm, as defendant did. They dissolved the firm with the knowledge of Williams’ chances against them for a part of the proceeds of that lot of tobacco, and they covenanted on their part, with such knowledge, to *88 pay all the debts the firm owed, and all the firm’s liabilities, and save harmless the defendant against the same. We think, by the contract and terms of the dissolution, the complainant and McGregor undertook the risk of a recovery of "Williams, and the payment of the same, and that the defendant cannot be onerated with the payment of any portion of said item.
The remaining and last item in contest between the parties, is, the item of $5,229.51, loss incurred in the Dortch speculation in tobacco. Complainant avers in his bill, that, in the settlement preparatory to a dissolution, this item was set down to the firm; that Mc-Gregor objected at the time, and insisted that the loss was upon an individual transaction of defendant, with V. B. Dortch, with which the firm had nothing to do, and it ought to be borne by defendant alone. But defendant asserted that the transaction was for the firm, and relying upon his statements, the point was yielded. But since the dissolution, from discoveries made, complainant has no doubt that the partnership was wrongfully charged with this item, etc.
Despondent in his answer, in substance, says, that complainant was aware from the beginning, that the firm of N. E. Alloway & Co., was a partner of Mr. Dortch in the transaction; that, before going into it, complainant and respondent consulted and agreed to go into it, for and on account of the firm; but fearing the credit and reputation of the firm might be injured in the estimation of Dortch, the banks and community, were it known that the house was engaged in large speculations, it was suggested by complainant, that Mr.. *89 Dortch be led to believe that the transaction was an individual one between himself and defendant.
W. B. Dortch, upon this point, proves that he and defendant agreed to go to Clarksville, to attend a tobacco sale at auction, and to purchase on speculation, if the prices suited; that they were to be jointly interested in the profits and losses; that with this understanding, they went together from Nashville to Clarks-ville, in March, 1858, and attended the sale, and purchased a large quantity of tobacco in' the name of Avitness. In the same Avay, they made other purchases in Clarksville, and afterwards in Nashville; in all, their purchases amounted to about fifty thousand dollars. Witness kneAV no person to be interested with him in the purchases of the tobacco, except Mr. Alloway, who was an equal partner Avith witness. Witness had a secret partner Avith him, whose name was afterwards disclosed to AlloAvay. He never mentioned the speculation to Bankhead or McGregor, and did not know they Avere to be interested in the transaction. The bills of purchase were made out in the name of W. B. Dortch, and forwarded to Nashville. The tobacco Avas shipped for sale to the house of McGregor, Allo-Avay & Co., New Orleans, in the name of W. B. Dortch. The tobacco Avas paid for, by agreement with defendant, by bills drawn by Dortch, on time, upon McGregor, AlloAvay & Co., NeAv Orleans, and discounted by the Union Bank at Nashville, and the proceeds paid for the tobacco; that it was customary, upon shipping to a commission house for sale, to draw upon the house, to be paid out of the sale of the produce; that the *90 time fixed for the payments of the hills drawn, was fixed by defendant. Witness wished to date the payment further off, to give more time for the sale of the tobacco. The prices 'of tobacco declined, and the sales, before the maturity of the bills, were not sufficient to lift them, and other bills were drawn in the same way and discounted, to lift the first; that witness and Bank-head left Nashville, on the evening of the 1st of May, 1858, for New Orleans, and traveled together, and witness mentioned the fact to complainant, that defendant was equally interested with witness in the purchase of the tobacco, before they left Nashville for New Orleans, and he afterwards frequently mentioned the fact to complainant. One reason for so doing, and the main reason, was, that it might increase the chances of a profit, for the firm to know that one of the house was interested in the adventure. The precise time and place that he so informed complainant, he cannot state. Witness never mentioned the subject to McGregor at any time, although he went with Bankhead to New Orleans, and stayed there about ten days; and they both left there at the same time, and traveled together as far as Helena, Arkansas, where complainant stopped off. Complainant never asked about defendant’s interest in the tobacco purchase. Witness voluntarily told him the adventure sustained a heavy loss.
When the sales were completed, the house of Mc-Gregor, Alloway & Co., made out the account against witness, and transmitted it about the 1st of August, 1858, to N. E. Alloway & Co., for collection. Witness was soon notified; and in the latter part of *91 August, or 1st of September, he paid one half of the loss to the firm of N. E. Alloway & Co. He regarded Alloway bound for the other half. He thinks he settled with complainant. One payment may have been made to Alloway, and the other to Bankhead. If the adventure had made a profit, he should have paid one half the profits to defendant, if living, if dead, to his heirs. The house of McGregor & Co., paid the bills drawn upon them, and sustained the loss in the first instance. The prices of tobacco were drooping when he arrived in the city of New Orleans, in the early part of May.
The defendant wrote a letter to the New Orleans house, dated March 27th, 1858, and amongst other things, he used the following language: “The writer returned from Clarksville this morning. During the writer’s visit he got a shipment of 111 hhds. from W. B. Dortch, Esq., of our city, purchased by him there, which will go forward to you by the Nashville, now there. Mr. D. will forward invoices. It is a good lot of tobacco; tell Eisher to do his very best on it, as we can make Mr. D. valuable to us. He offers us a half interest in it, which we are much inclined to take, and think we will.”
On the 20th of April, 1858, defendant again wrote to the New Orleans house: “Our friend Mr. Dortch is quitq sick. We have made out for him, and now hand you herewith, invoice of 91 hhds. of tobacco, shipped per Josephine Savage, from Clarksville.” It will be observed that there is no intimation in this letter, that the house in Nashville had consented to *92 take an interest in tlie Dortch speculation. On the 1st of May, 1858, the same day complainant left Nashville for New Orleans, McGregor wrote to N. E. Alloway & Co., on business of the firm, to which he added a postscript in these words: “The Dortch purchase will turn out badly, as we fear; if you are interested, and should he not be responsible, do not go any further.”
On the 6th of May, defendant wrote to the New Orleans house, acknowledging the receipt of McGregor’s letter, of May 1st, and answered the business therein alluded to, but no where alludes to the Dortch adventure in tobacco. Again, defendant wrote to the New Orleans house on the 25th of June, and added, by way of postscript: “We have received all Mr. Dortch’s bills, and he wishes the tobacco held. Please do so, unless opportunities offer for selling portions of it favorably at times.” On the next day, June 26th, defendant wrote to the New Orleans firm: “Dortch has renewed all his bills sixty days, and he expects the tobacco held, unless you can make favorable sales of it from time to time.” On the 31st of July, McGregor wrote to N. E. Alloway & Co., inclosing Dr. Thompson’s account current, showing the balance due the firm, and also stating in substance: “We have ready the account of sales of Dortch’s tobacco, but not the account of the losses, but the loss will be considerable on the speculation.” On the 9th of August, defendant wrote to the firm at New Orleans, amongst other things: “We telegraphed to you to-day to send up the original bills and invoices of the Dortch tobacco, that *93 Mr. D. may examine tlie same; be will promptly arrange his share of the losses.” We remark here, while passing, that this letter of the 9th of August, written by Alloway himself, is the first in all the correspondence between the two houses to which our attention has been directed, or which we have been able .to find in this voluminous transcript, which intimates that the losses on the Dortch tobacco speculation were not to be borne by Dortch alone, or that any other person but himself, was interested in the adventure; and said letter, of the 9th of August, only states that Dortch would promptly pay his part or share of the loss.
In addition to this, Brothers proves that he was clerk and book-keeper in the house in New Orleans, during the year 1858; and the balance exhibited against W. B. Dortch, on the books of McGregor, Alloway & Co., on the tobacco speculation, is $10,-459.02, and that he has carefully examined the correspondence of the Nashville house with McGregor, Alloway & Co., during the time, and has been unable to find any advice from the Nashville house that the firm was interested in the adventure. Matthew Watson, with the books of the two houses, before him, proves, that prior to the 22d of September, 1858, there is no entry on the books of N. E. Alloway & Co., charging Mc-Gregor, Alloway & Co., with one half, or with any portion, of the loss on the tobacco of W. B. Dortch. But he does find on the books of N. E. Alloway & Co., an entry, dated 2d of September, 1858, by which W. B. Dortch is charged to McGregor, Alloway & *94 Co., for balance of account, $10,459.02, and Mc-Gregor, Alloway & Co., are credited with tbe same; and be can find no where upon tbe books of N. E. Alloway & Co., in tbe profit and loss account, prior to tbe 22d of September, 1858, that said loss on tbe Dortch tobacco, or any portion of it, is charged off.
Taking the pleadings and proof together, and the important facts that defendant and Dortcb entered into tbe speculation in March, 1858, to be equal partners in profits and loss in tbe adventure, and Dortcb knew no one to be interested with him, except defendant; and tbe further fact that the tobacco was bought in tbe name of Dortcb, and bailed and shipped in bis name to McGregor, Alloway & Co., at New Orleans; and the further fact contained in tbe letter written by Al-loway on tbe 27th of March, to tbe New Orleans house, that be bad got a shipment of 111 hogsheads of tobacco of W. B. Dortcb, that we can make him valuable to us, and be offers us a half interest in the speculation, and we are inclined to take it; we entertain no doubt that tbe defendant went into tbe speculation, originally, on his individual account, with Dortcb. His letter of tbe 27th of March, was not true in point of fact, if Mr. Dortcb is not mistaken. He swears be never offered tbe firm one half or any other interest. He originally gave defendant a half interest on bis own private account, and did not know defendant’s partners in tbe transaction. Defendant did not know when be wrote said letter, that he himself, was a silent partner with Dortch. It was a speculation outside of tbe legitimate scope and business of the *95 firms; and defendant’s partners had a right to know it if it was intended for the firm, and it was his duty to inform his partners in business of the adventure. It being outside of the legitimate business of the firm, the firm was not bound by the undertaking of defendant, even if gone into for the firm originally, without the previous consent of the co-partners, or their subsequent ratification. With a knowledge of the facts, more especially did good faith and fair dealing require defendant to disclose the fact that the firm was involved in the adventure, after the inquiry and warning contained in the letter of McGregor, of the 1st of May; but defendant remained dumb and silent upon that point, until his letter of the 9th of August, after McGregor’s letter of the 31st of July, had notified him that the Dortch tobacco was sold, and the loss would be considerable. Then it was, on the 9th of August, defendant said to his firm in New Orleans, that Mr. Dortch would promptly pay his share of the loss; how much, he did not say, nor did he intimate whether he or his firm, would pay the other share.
The general doctrine upon the power of one member of a firm of co-partners to bind the firm upon a transaction outside of the business of the firm, seems to be this: If one partner should, in the name of the firm, make purchase of goods not connected with the knoAvn business of the firm, such purchases will not bind the partnership unless they should assent thereto: Story on partnership, sections 112, 113, 126, 127, 106 and 107.
The principle on this subject, is, that the acts of *96 each partner, to bind tbe firm, must be confined witbin tbe limits or scope of the partnership business. If these are transcended, there must be an expression or implied authority shown, or a subsequent ratification proved by the person claiming to hold the firm liable: Furguson vs. Shepherd and Gordon, 1 Sneed, 254; and Bank of Tennessee vs. Saffarans, 1 Hump., 597; but in this case, the partnership name was not used in the contract between defendant and Dortch, when they agreed to embark into the tobacco speculation. Dortch contracted with Alloway alone, believing him alone interested and liable.
"Without further comment upon this question, we are constrained to believe, that defendant went into the tobacco speculation with Dortch, on his own individual account, and not on behalf of his firm; that the adventure proved to be a losing business, and that upon the dissolution on the 22d of September, 1858, defendant represented to his partners that he went into the speculation for, and on account of the firm, and they relying upon his representation, put down to the loss of the firm, one half the account charged against Dortch, to-wit: said sum of $5,229.51, which constituted a part of the net losses which formed the basis of said dissolution of 22d of September, 1858; that the firm in that settlement, was wrongfully and fraudulently overrated with said sum, when, in fact, and in law, it Avas the loss of defendant individually, and ought to have been paid by him. But as the defendant in said settlement and dissolution, paid one third of said loss, we hold him liable to complainant for the other *97 two-thirds, with interest from the date of said dissolution until paid.
We therefore decide: First, That defendant shall pay-complainant one third of the Thompson debt due on the 22d of September, 1858, less the sum of $375.75, paid upon it since that time, with interest since the date of the dissolution. In this is meant to include what is called the returned commissions. Second, One third of the $1,107.78, with interest, the returned commissions of J. L. Bradley’s account. Third, Two thirds of $5,229.51, the loss on the Dortch tobacco speculation, with interest oh said two thirds until paid. And we do not think respondent is liable for the losses, upon the Eodwall & Co. speculation, nor for the results of the suit of Williams against the firm, arising out of the Barker and Diffinderfer transaction. And the Chancellor’s decree will be modified according to this opinion. And the defendant will pay all the costs in the Chancery Court, and each party pay one half the costs in this’ court.